1
2
3
4          IN THE UNITED STATES DISTRICT COURT

5        FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   ROMMEL B. VALERA,                    )
                                         )
8              Petitioner,               )        No. C 05-2568 JSW (PR)
                                         )
9        vs.                             )        ORDER DENYING PETITION
                                         )        FOR A WRIT OF HABEAS
10  A. P. KANE, Warden,                  )        CORPUS
                                         )
11             Respondent.               )
    _____     )

12

13

14                       **<u>INTRODUCTION</u>**

15         Rommel B. Valera, a prisoner of the State of California currently

16  incarcerated at the Tallahatchie County Correctional Training Facility in

17  Tutwiler, Mississippi, has filed a pro se petition for a writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  This Court ordered Respondent to show cause as

19  to why two claims raised in the petition should not be granted.  Respondent filed

20  an answer, a memorandum of points and authorities in support thereof, and

21  exhibits.  This order denies the petition for a writ of habeas corpus on the merits.

22                   **<u>PROCEDURAL BACKGROUND</u>**

23         Petitioner was convicted by jury trial in Santa Clara County Superior

24  Court of attempted murder, assault with a deadly weapon, and shooting into an

25  inhabited dwelling with enhancements that he personally used a firearm and that

26  he inflicted great bodily injury. He was sentenced to 34 years and eight months in

27  state prison.

28         Petitioner appealed his conviction to the California Court of Appeal, Sixth

District, which affirmed the conviction in an unpublished, reasoned opinion filed July 20, 2004.  On September 29, 2004, the California Supreme Court denied review.  On June 23, 2005, Petitioner filed the instant petition.

### FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized in relevant part, as follows:

Twenty-seven-year-old [Petitioner] and 17-year-old Romalyn Poquiz met at the board and care home where they each worked. They started dating, but two months later Romalyn broke off the relationship because she did not want to be tied down and wanted to date other men. . . . According to Romalyn, [Petitioner] had been calling her repeatedly during the week trying to persuade her to resume the relationship, but Romalyn, who had a fiancé with whom she had had a child back in the Philippines and who was dating other men, refused. . . . .

According to [Petitioner], Romalyn and he broke up when she started seeing another man and they argued about it. By September 28, they were "just friends already" and did not sleep together although they still went out together. Romalyn had told [Petitioner] she loved him the first time she talked to him, and after about a week, asked him for $250. Even after the breakup, she discussed the men she was dating with him. On his birthday[,] nine days before the incident, Romalyn asked [Petitioner] for a ride to the mall. She did not give [Petitioner] a birthday card, and as it turned out, there was a man waiting for her at the mall. This upset [Petitioner], who did not call her until the day of the incident despite numerous calls from her.

According to Romalyn, when she returned [Petitioner]'s call, the conversation was normal until [Petitioner] realized she was also talking to another man on her cell phone. His jealousy flared and he called her a "bitch" and a "ho" and threatened to tell her family, her brother, and her fiancé that she was going out with him. He added he would tell her brother Romanito that he still loved her. Romalyn did not think [Petitioner] sounded drunk and she had never known him to drink alcohol, and she became angry and frightened. She handed the phone to her brother Romanito and told him that [Petitioner] was calling her names and yelling at her and she did not want to see or talk with him again.

. . .

Romanito finally suggested that [Petitioner] "come here and we'll do something about it ." [Petitioner] replied, "yeah, okay we're going to come and get you." Romanito did not know [Petitioner's] name, phone number, or address but Romalyn told Romanito that [Petitioner] knew where he lived and worked and what he looked like. Romanito became

2

frightened by the threat. He believed [Petitioner] was going to bring his friends to the apartment to "get" him.

Romanito thought he had better have support and telephoned several of his friends aged 19 to 22 to come to his place. . . .

Romanito and [Petitioner] had another heated exchange and cursed at each other. Romanito stated, "[i]t got heated up so bad that he said he's coming for me, he has a bullet for me. And I ... told him back ... Oh yeah ... I'm going to kill you too." Romanito believed [Petitioner] intended to kill him and was afraid. . . .

A little later, [Petitioner] called Romanito and apologized for calling so often that night. He sounded calmer, so Romanito agreed he could "come over" and apologize in person and then "just go home."

. . .

[Petitioner] arrived about 15 minutes after talking to Romanito . . . and parked in front of the carport. As he got out of the car, Romanito saw him adjust his jacket and shirt which made him think "something was wrong." Somebody asked [Petitioner] if he was smoking anything and [Petitioner] said, "no, I'm just drunk." [Petitioner] asked to speak to Romalyn's brother, and the group pointed to Romanito. Romanito recognized [Petitioner]'s voice as that of the man he had spoken with on the phone that night, and [Petitioner] walked into the carport and apologized to him.

[Petitioner] said that he was in love with Romalyn and asked to see her so that he could apologize to her as well. Because [Petitioner] appeared drunk to Romanito, he said that she was asleep and that [Petitioner] should go home and come back the next day to speak with her. [Petitioner] asked to see her several more times, saying, "I need to talk to her, I need to explain to her...." Romanito repeatedly told [Petitioner] to go home, but finally agreed to summon Romalyn until [Petitioner] called him "brother." This angered Romanito, who "g[o]t up there in [Petitioner]'s face," and was "ready to punch [Petitioner] out." He said, "You shouldn't be doing that man or I'll sock you." All of Romanito's friends were watching. . . .[Petitioner] remembered being surrounded by Romanito's friends. Romanito asked, "why are you calling my sister ... a b[itch] and a whore?". . . .

[Petitioner] thought he was going to get beaten up. When Romanito got close to [Petitioner], [Petitioner] pulled a silver handgun from under his shirt and started shooting at him. . . . Romanito ducked and ran. . . . As Romanito ran into the street, he looked back and saw that [Petitioner] was shooting directly at him because the muzzle of the gun was pointed at him and flashed in his direction. [Petitioner] followed him into the street and continued firing but then turned back and reentered the carport and started shooting at the others. Romanito got to the 7-Eleven and called 9-1-1. While he was on the phone with the operator, he heard seven or eight more shots.

3

. . . . [Petitioner's] shots hit the back wall of the carport where others were hiding. They were shouting at each other to keep away from [Petitioner] and to [Petitioner] to "stop please" shooting at them. However, [Petitioner] walked between the cars parked in the carport and kept shooting until he ran out of ammunition.

[Petitioner] returned to his car, reloaded the gun, and resumed firing at the carport. . . . [Just before leaving, Petitioner] called out, "who is scared now?" and got in his car, fired several shots into the air . . . and sped [away].  As he left, he shouted, "I'll kill you mother fucker."

. . .

Meanwhile, Romanito ran back to the carport and found [his friend] Arejola lying on the ground.  He had been shot; there was a bullet hole where the shot had exited his buttocks, he was bleeding, and his left hip was numb. He was shaking violently. He was taken to the hospital where he stayed for several hours while his wound was dressed. He was in severe pain for several weeks, limped during that time, and missed a month of work due to medication. He had permanent scars from the two bullet holes.

Five spent shell casings from a .357 magnum handgun were recovered from the driveway of the carport near the street, a hollow-point live round was on the ground between two cars in the carport, and spent shells were also found embedded in the seat of a white Honda, the van, a wooden storage cabinet near the rear of the carport, and from a closet in the bedroom of the first floor apartment directly behind the carport. Four children were asleep in that bedroom at the time of the shooting.

[Petitioner] was arrested in front of his residence. He asked the officer who drove him to jail, "Who did I shoot? Did I hit anyone." When the officer replied he knew nothing about the incident, [Petitioner] stated, "it was self defense.... They attacked me so I began shooting."

. . .

[Petitioner] later waived his Miranda rights and stated, in relevant part, that he was still in love with his ex-girlfriend and that he called her on the night in question, he was drinking beer, and they fought about the breakup. The girl's brother, whose name he did not know, cursed him over the phone, suggested they have a "shootout," and the brother's friends mocked him over the phone. The brother called him a "coward," "chicken," and "fool" and [Petitioner] took his father's silver .357 magnum handgun, loaded it, and put it in his waistband. He was angry and decided to confront the brother. He drove there alone and the brother and his friends appeared surprised to see him. The brother threatened to beat him up and tried to hit him. [Petitioner] became afraid, drew the gun and started shooting. Everyone ran. [Petitioner] just wanted to scare them, did not aim at anyone, and did not realize he had shot anyone. [Petitioner] aimed and fired several shots at the brother and then shot at another man standing nearby. He shot several rounds in the air and fired

4

once at the van. He reloaded and continued shooting because it was "a shootout," despite seeing people "crawling around" on the ground. After he shot at the wall, his best friend Syquio drove up and told him to stop because no one was shooting back, but [Petitioner] refused. [Petitioner] told Syquio's girlfriend Aradanas that "they force[d] me ... to do it." [Petitioner] stated he knew he could have killed someone and he knew he would go to jail for the shooting.

When [Petitioner] testified at trial, he gave substantially the same statement[.] . . . .

[Petitioner] was charged with one count of attempted murder of Romanito Poquiz with the allegations that he personally used and discharged a firearm (Pen.Code, §§ 664, 187, 12022.53, subds.(b), (c), and 12022.7, subd. (a), count 1); three counts of assault with a deadly weapon (§ 245, subd. (a)(2), counts 2, 3, and 4), with a great bodily injury allegation on count 2 (§ 12022.7, subd. (a)); and one count of shooting into an inhabited dwelling (§ 246, count 5) with the allegations for each that he personally used a firearm in the commission of the offense. (§ 12022.5, subd. (a)(1)).

Jury trial commenced on March 12, 2003, and eight days later the jury found [Petitioner] guilty as charged and the allegations true.

*People v. Valera*, No. H026025, 2004 WL 1615986 (Cal. Ct. App. July 20, 2004), at

*1-6 (Cal. Ct. App. Jun. 12, 2003) (footnotes omitted).

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

6

The only definitive source of clearly established federal law under

28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

If the state court decision only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

In his petition for a writ of habeas corpus, Petitioner asserts two claims for relief: (1) the jury instructions provided by the trial court, relating to lesser included offenses and voluntary intoxication, violated Petitioner's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments; and (2) Petitioner's sentence violates the Eighth Amendment command against cruel and unusual punishment.

## DISCUSSION

### 1.    Jury Instructions

Petitioner claims that the trial court violated his right to due process and a fair trial when it provided certain jury instructions. Specifically, Petitioner contends that

the trial court improperly instructed the jury not to consider lesser offenses until it unanimously agreed to acquit on the greater offenses.  Petitioner also contends that the trial court erred by omitting reference to "mental state" in its reading of the voluntary intoxication instruction to the jury.

### A.    Legal Standard

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an

8

error has occurred, however.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. at 637, before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47; *see, e.g., Sarausad v. Porter*, 479 F.3d 671, 679 (9th Cir. 2007) (finding reasonable likelihood that jury applied ambiguous instruction on accomplice liability to find defendant guilty of murder in a way that relieved the State of its burden of proof, and that this error was not harmless).

### B.      Analysis

### I.      Lesser-Included Offense Instruction

Petitioner claims that the trial court erred by providing an acquittal-first instruction regarding lesser included offenses, in violation of *People v. Kurtzman*, 46 Cal.3d 322, 333 (1988).  Petitioner argues that his rights were violated by the trial court's issuance of jury instructions CALJIC Nos. 17.49, 8.42, and 8.43, as well as the prosecution's repeated assertions of the acquittal-first instruction without correction by the court.  Petitioner claims that the issuance of CALJIC No. 17.10, which conforms to the ruling in *Kurtzman* by allowing the jury to deliberate in any order it chooses but requires the determination of guilt in a certain order, did not cure the error.

CALJIC No. 17.49 explains to a jury the use of multiple verdict forms when a charged count includes lesser included offenses.  In pertinent part, it instructs a jury that if it finds a defendant guilty of a greater offense, that it should disregard the verdict forms on the corresponding lesser offenses.  However, if the jury finds the defendant not guilty of the greater offense, then it needs to complete the verdict form on the lesser included offenses.  CALJIC No. 8.42 explains to a jury the reduction of homicide to manslaughter as a result of a quarrel, heat of passion, or provocation.  CALJIC No. 8.43 explains to the jury about the "cooling period" that would cause a reasonable

9

person to return to reason, obviating any defense provided by CALJIC No. 8.42.

Under California law, the court's issuance of CALJIC No. 17.49 to explain multiple verdict forms is appropriate and conforms to *Kurtzman* when the CALJIC No. 17.10 advisement is also provided. *See People v. Dennis*, 17 Cal. 4th 468, 536-37 (1998). In *Dennis*, the California Supreme Court held that such an advisement keeps the jury deliberations from being improperly controlled. The jury instructions in this case did not preclude the jury from deliberating or discussing the lesser included offenses before returning a unanimous guilty verdict on the greater offense. *See People v. Visciotti*, 2 Cal. 4th 1, 60 (1992). In fact, CALJIC No. 17.10 clearly instructs the jury that it may deliberate in any order, and that it might even find it productive to reach tentative conclusions on all the charges and lesser crimes before reaching final verdicts. The combination of instructions did not improperly control jury deliberations, it merely provided an order for returning verdict forms. Although Petitioner argues that the instruction vitiated the prosecution's burden of proof, Petitioner points to no Supreme Court precedent under which a similar instruction was determined to be constitutionally inform. The instruction was also found to be proper under California law.

The state court's decision upholding the trial court's instructions is not contrary to, or an unreasonable application of established Supreme Court precedent. There is no indication in the record that the jury applied the challenged instructions in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4; *Boyde*, 494 U.S. at 380 (1990); *see, e.g., Ficklin*, 177 F.3d at 1150-51. Therefore, Petitioner's claim is DENIED.

### ii.       Prosecution's Closing Argument

In support of his argument, Petitioner claims that the prosecution improperly controlled the jury deliberations by repeating the acquittal-first instruction in its

summation. In its review of this claim, the California Court of Appeal held that, "[Petitioner's] failure to object [during the prosecution's closing argument] waived the issue."

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal ground and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The existence of a state procedural bar will not by itself foreclose this Court's jurisdiction; the state court decision must have relied on the procedural bar independent of federal law. *See Harris v. Reed*, 489 U.S. 255, 262 (1989); *Ulster County Court v. Allen*, 442 U.S. 140, 152-54 (1979). This Court will not assume that the state court decision rests on adequate and independent state grounds when the "state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983). "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision."

To be "adequate" the state procedural bar cited must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. United States Dist. Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotations and citation omitted), *cert. denied*, 520 U.S. 1204 (1997). The state bears the burden of proving the adequacy of a state procedural bar. *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir.), *cert. denied*, 540 U.S. 938 (2003).

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to

authority demonstrating inconsistent application of the rule.  Once having done so, however, the ultimate burden is the state's.

*Id.  See also Carter v. Giurbino*, 385 F.3d 1194, 1198 (9th Cir. 2004) (finding that the state has met its burden where petitioner failed to "argue or come forward with any evidence" that the procedural rule is not firmly established and regularly followed by the California courts).

Here, the California Court of Appeal clearly and expressly foreclosed the prosecutorial misconduct claim as a result of trial counsel's failure to object to the prosecutor's closing argument regarding the acquittal-first instruction.  Under California's contemporaneous objection rule, a failure to object at trial waives an issue on appeal.  *See People v. Berryman*, 6 Cal. 4th 1048, 1072, *overruled on other grounds*, *People v. Hill*, 17 Cal. 4th 800, 823 (1998) (overruling *Berryman* to the extent that *Berryman* required a showing of bad faith to establish prosecutorial misconduct). California's contemporaneous objection requirement is well established.  *See* Cal. Evid. Code § 353.

The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial.  *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999).  *See also Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999).  Because petitioner has not demonstrated cause and prejudice or a fundamental miscarriage of justice, he fails to meet the burden required to overcome this procedural bar.  *See Coleman*, 501 U.S. at 750.

However, even if the claim were not waived, it would still fail on the merits.  A prosecutor's mischaracterization of a jury instruction is less likely to render a trial

12

fundamentally unfair than if the trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court.  This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384-85 (1989) (citations omitted).  Here, any arguable mischaracterization of the law by the prosecutor was cured by the proper combination of CALJIC Nos. 17.49 and 17.10 that was issued by the trial court.  This combination of instructions made clear to the jury that they could deliberate on the greater offense and lesser included offenses in any order, but that once they reached their verdict they were required to complete the verdict forms in a specified order.

### ii.     Voluntary Intoxication Instruction

Petitioner next claims that the trial court erred in its issuance of the voluntary intoxication instruction, CALJIC No. 4.21.1.  Specifically, Petitioner contends that the instruction was incorrect and incomplete because it precluded the jury from considering his intoxication on the issue whether he had the "knowledge" required for an assault conviction.  In its reading of CALJIC 4.21.1 to the jury, the trial court only referred to "specific intent" and omitted all references to "mental state."  CALJIC No. 4.21.1 provides:

> It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. . . . ¶ However, there is an exception to this general rule, namely, where a [specific intent] [or] [mental state] is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required [specific intent] [or] [mental state] at the time of the commission of the alleged crime. . . . ¶ If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not [that] defendant had the required [specific intent] [or] [mental state]. ¶

13

> If from all the evidence you have a reasonable doubt whether a defendant had the required [specific intent] [or] [mental state], you must find that defendant did not have that [specific intent] [or] [mental state].

The California Court of Appeal found that there was no error in the issuance of CALJIC 4.21.1 here because "[a]ssault with a deadly weapon is not a specific intent crime and the court should not instruct the jury to consider evidence of defendant's intoxication in determining whether he committed assault with a deadly weapon." *Valera*, 2004 WL 1615986, at *9.  The California Court of Appeal based this holding on California Penal Code section 22, which provides that:

> (a) ... [e]vidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, **knowledge**, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible **solely** on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Emphasis added.)

The Court of Appeal determined that there was no error because under California law, assault with a deadly weapon is a general intent crime.  *People v. Hood*, 1 Cal. 3d 444, 453 (1969).  It does not require a specific intent to injure the victim, nor does it require juries to consider evidence of the intoxication in determining whether a defendant committed the crime. *Id.* at 458-59.  This legal principle in California has been reaffirmed by the California Supreme Court.  *See People v. Williams*, 26 Cal. 4th 779, 788 (2001).

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  In other words, a writ of habeas corpus is available under § 2254(a) "only on the basis of some transgression of federal law binding on the state courts."  *Middleton v. Cupp*, 768 F.2d

1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)), *cert. denied*, 478 U.S. 1021 (1986).  It is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Engle*, 456 U.S. at 119; *Peltier v. Wright*, 15 F.3d 860, 861-62 (9th Cir. 1994).

The California Court of Appeal decision upheld the use of this instruction as proper under California law.  Unless there was a transgression of federal law, the writ of habeas corpus is unavailable.  *Middleton*, 768 F.2d at 1085.  The writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  *Estelle*, 502 U.S. at 67-68.  Here, Petitioner argues that the CALJIC No. 4.21.1 instruction as read to the jury represented constitutional error.  Petitioner argues that by removing reference to "mental state" in the instruction, the jury was foreclosed in its ability to consider his knowledge at the time of the offense.  According to the California Court of Appeal, there was no error under California law.  First, California Penal Code section 22 prohibits admitting evidence of voluntary intoxication to negate the capacity to form mental states, including knowledge, for the crime charged.  Second, under *Williams*, assault with a deadly weapon is a general intent crime.  The Court of Appeal decision finds the trial court instructions proper under California law.  However, even if there was error in the interpretation or application of California law, without a transgression of federal law, the writ of habeas corpus is unavailable.  *Middleton*, 768 F.2d at 1085.

Even if Petitioner had established that the instruction in some way violated his federal constitutional rights, to obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle*, 502 U.S. at 72.  Petitioner has not shown that there is a "reasonable likelihood" that the jury has applied

the challenged instruction in a way that violates the Constitution.  *Id.* at 72, n.4.   The decision of the California Court of Appeal decision was not contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Nor has Petitioner established that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**2.**    **Eighth Amendment Violation**

Petitioner claims that the sentence he received of thirty four years and eight months is disproportionate to the severity of the crimes of which he was convicted. Petitioner argues that the trial court's imposition of a twenty year consecutive term enhancement for the intentional and personal discharge of a firearm on the attempted murder charge, pursuant to California Penal Code section 12022.53(c) violates the Eighth Amendment.

In evaluating the Eighth Amendment claim, the California Court of Appeal held:

In assessing whether punishment is cruel or unusual, i.e., whether a punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity" (*In re Lynch* (1972) 8 Cal.3d 410, 424), the court should (1) consider the nature of the offense and/or the offender, (2) compare punishments imposed by the same jurisdiction for more serious offenses, and (3) compare the punishment to other punishments imposed by other jurisdictions for the same offense. ( Id. at ¶. 425-427.)

. . .

[W]e reject defendant's claim here. First, we note that the trial court did not have the discretion to strike the 20-year term under section 12022.53. Subdivision (h) of that section states "[n]otwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section . . . ."

Second, the provocation was insignificant in comparison to the violent response against not only the provoker but a group of innocent, uninvolved people.  Defendant clearly presents an ongoing danger to the community because he believed that a few disrespectful phone calls justified an armed confrontation that was in no way forced on him. Defendant intentionally and personally discharged a firearm and earned

the 20-year sentence.  There was no error.

*Valera*, 2004 WL 1615986, at *11-12.

### A.  Legal Standard

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  *Solem v. Helm*, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment).  But "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare."  *Id.* at 289-90.  For the purposes of review under 28 U.S.C. § 2254(d)(1), it is clearly established that "[a] gross proportionality principle is applicable to sentences for terms of years."  *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003).  However, the Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.  *Ewing v. California*, 123 S. Ct. 1179, 1187 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring)).

A challenge to the proportionality of a sentence should be analyzed using objective criteria, which include: (1) the gravity of the offense and the harshness of the penalty; (2) a comparison of sentences imposed on other criminals in the same jurisdiction; and (3) a comparison of sentences imposed for the same crime in other jurisdictions.  *Solem*, 463 U. S. at 290-92.  Under this proportionality principle, the threshold determination for the court is whether Petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.  *United States v. Bland*, 961 F.2d 123, 129 (9th Cir.) (quoting *Harmelin*, 501 U.S. at 1005), *cert. denied*, 506 U.S. 858 (1992); *accord Ewing*, 123 S. Ct. at 1180 (applying *Harmelin* standard).

Only if such an inference arises does the court proceed to compare Petitioner's sentence with sentences in the same and other jurisdictions. *See Harmelin*, 501 U.S. at 1004-05; *Bland*, 961 F.2d at 129; *cf. Ewing*, 123 S. Ct. at 1187 (noting that *Solem* does not mandate comparative analysis within and between jurisdictions). Where it cannot be said, as a threshold matter, that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

**B.     Analysis**

The decision of the California Court of Appeal is not contrary to, or an unreasonable application of, federal law as established by the Supreme Court of the United States. The three inquiries used by the Court of Appeal are substantially similar to the three-part analysis established by *Solem*, 436 U.S. at 290-92. The California Court of Appeal relied on *In re Lynch,* 8 Cal. 3d 410 (1972) as authority for its three-part analysis. *See Valera*, 2004 WL 1615986, at *11. *In re Lynch*, on the other hand, relied on the Eighth Amendment and United States Supreme Court precedent to form its three-part analysis. *See In re Lynch*, 8 Cal. 3d at 425-27. Applying *In re Lynch*, the California Court of Appeal conducted a "threshold analysis" by comparing whether the crime Petitioner committed and the sentence imposed raised an inference of "gross disproportionality."

As the Court of Appeal noted, Petitioner committed a very serious crime. Petitioner obtained two deadly weapons and extra ammunition, drove twenty five minutes from a place of safety to seek out Romanito, whom he did not know, and shot at several unarmed young individuals who, with the exception of Romanito, were in no way threatening him. He kept shooting at these unarmed individuals as they were running away and scrambling for safety. He  reloaded his handgun when it ran out of

18

ammunition, and kept shooting, including into the carport wall behind which young children were sleeping.  Petitioner committed multiple serious felonies, including attempted murder, assault with a deadly weapon, and discharging a firearm at an inhabited building.  As the trial court judge stated, "[t]his is a sad case" but that "[i]n a certain respect it's a not so sad case because there could have been a lot of dead kids, . . . that night."  *Valera*, 2004 WL 1615986, at *10.  While Petitioner does not have a significant criminal record, that fact alone does not render a harsh punishment cruel and unusual when it is imposed in connection with a serious crime.  *See, e.g., Harmelin*, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for *first* offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).

Because this Court finds no inference that Petitioner's sentence was "grossly disproportionate" to his crime, Petitioner's claim fails and further comparative analysis of Petitioner's sentence is unnecessary.  *See Harmelin*, 501 U.S. at 1004-05.  The California Court of Appeal, however, did compare Petitioner's sentence to the penalty for other serious offenses in California; comparisons that substantially resemble the other prongs of *Solem*.  *See Solem*, 463 U. S. at 290-92.  Specifically, the California Court of Appeal provided a lengthy comparison of Petitioner's case to *People v. Martinez*, 76 Cal. App.4th 489, 492 (Ct. App. 1999), a case on point with compellingly similar facts.

The California Court of Appeal's conclusion that Petitioner's sentence was not grossly disproportionate to his crime is not contrary to, or an unreasonable application of, controlling federal law.  *See Lockhart*, 250 F.3d at 1232 (holding that if the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts.)  The state court decision was in accord with *Solem* and its progeny.  The legal rules

19

were not applied unreasonably to the facts.  As such, Petitioner's sentence does not violate the Eight Amendment and his claim fails.

## **CONCLUSION**

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is DENIED.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  September 30, 2008

_____
JEFFREY S. WHITE
United States District Judge

20

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

VALERA,

            Plaintiff,

  v.

CALIFORNIA SUPREME COURT et al,

            Defendant.

_____/

Case Number: CV05-02568 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 30, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Rommel B. Valera
T93689
Tallahatchie County Correctional Training Facility
415 U.S. Highway 49 North
Tutwiler, MS 38963

Dated: September 30, 2008

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk